IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

JERRI JACKSON

    Plaintiff,

v.

CINEMARK, USA, INC., d/b/a CENTURY AURORA 16,

    Defendant.

_____

COMPLAINT AND JURY DEMAND
_____

    Plaintiff, Jerri Jackson, by and through her attorneys MALMAN LAW FIRM, LLC, and hereby submits her Complaint and Jury Demand against the above captioned Defendant.  As grounds therefor, Plaintiff states and alleges the following:

### **JURISDICTION**

    1.    At all times relevant to this case, Plaintiff Jerri Jackson (hereinafter "Plaintiff") is a resident of the State of Ohio, and she presently resides at 2115 Duquesne Drive, Springfield, Ohio 45506.

    2.    Plaintiff Jerri Jackson is the mother of Matthew McQuinn, who was born March 26, 1985.

    3.    Upon information and belief, Defendant Cinemark, USA, Inc. d/b/a Century Aurora 16 (hereinafter "Defendant") is a Texas corporation with its principal place of business at 3900 Dallas Parkway, Suite 500, Plano, Texas 75093.  The theater (hereinafter "theater") where the incidents forming the basis for this Complaint was and is located at 14200-14300 E. Alameda Avenue, Aurora, CO 80012 in the County of Arapahoe, State of Colorado.

    4.    This Court has jurisdiction over Plaintiff's claims against this Defendant pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship between the parties and the amount in controversy herein exceeds the sum of $75,000, exclusive of costs and interest.

5.      Venue is proper herein pursuant to 28 U.S.C. § 1391 (b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in the District of Colorado.

## GENERAL ALLEGATIONS

6.      Upon information and belief, before July 20, 2012, Defendant had information that previous disturbances, incidents, disruptions and other criminal activities had taken place at or near the property of the theater. These incidents most commonly took place during the evening hours.

7.      Based upon this knowledge, Defendant hired various security personnel, including but not limited to, off-duty law enforcement officers from the City of Aurora Police Department.

8.      That security personnel were not present at all times the theater was open. However, upon information and belief, those guards were placed on Friday and Saturday nights only.

9.      Included in the previous incidents at the mall was at least one shooting, involving gang members. These previous incidents also included assaults and robberies.

10.     The theater had public parking available on all sides of the theater, including behind Auditorium 9.

11.     The theater advertised and sold tickets to the July 20, 2012 midnight premier of the movie, "The Dark Knight Rises." Defendant charged people who attended the movie and the theater showed the movie in more than one auditorium because of the crowds it anticipated.

12.     Although the theater was showing a midnight premier of the movie and was expecting large crowds of people to attend the midnight showing, no security personnel were present for that showing.

13.     Upon information and belief, security personnel were present at the theater earlier in the day, when box office cash was being transferred.

14.     The exterior doors to the theater were lacking in any alarm system, interlocking security systems, or any other security or alarm features which would have put Defendant's employees or security personnel on notice that someone had surreptitiously left the theater by the exterior door and had put the door in an open position which would facilitate a surreptitious and unlawful re-entry.

15.     Upon information and belief Defendant did not have in place any security practices or procedures, nor did it employ or adequately train any employee or security personnel

to prevent or deter someone to surreptitiously and unlawfully re-enter the theater through an unlocked and unalarmed door.

16. Upon information and belief, there was no system or procedure for the theater personnel to survey or monitor the parking areas and external doors behind or to the sides of the theater. This failure to monitor those doors in any way made it possible for a person to re-enter the theater without fear of inference, interruption or chance at being discovered, and to leave the door open for a period of time.

17. One of the people present at the midnight showing entered the theater on at least one occasion through a door that was located at the right, front side of the screen in Auditorium 9. Hereinafter, that person shall be referred to as "the gunman."

18. The gunman purchased a ticket and entered the theater initially through the normal patron entrance. Later, after the theater lights were darkened and the screen projection began, the gunman left his seat and moved to an exterior door, located at the right, front of the movie screen, exiting to the parking area.

19. At some point, the gunman moved his car so that he was parked very near to the exterior door to Auditorium 9.

20. While the screen projection continued in the darkened theater, the gunman opened the exterior door to Auditorium 9, put the door in a position where it would remain open, and went to his car which he had earlier placed outside that exterior door.

21. That exterior door was unlocked, and had no alarm or other monitoring system to guard against the door being kept open. The gunman had parked his car in the available parking spaces directly outside of the exterior door to Auditorium 9.

22. The gunman was able to have sufficient time to transfer several weapons as well as ammunition at or near this door without being discovered by any theater personnel.

23. This person had a virtual arsenal of weapons, including, but not limited to, one or more fully loaded shotguns, an AR-15 assault rifle, one or more fully loaded, automatic Glock handguns, and several tear gas canisters. The gunman also retrieved and put on body armor and a gas mask. He also had significant amounts of ammunition, including a fully leaded "banana clip" for the assault rifle.

24. Because of the amount of weaponry and ammunition, the gunman required time without fear of monitoring to transport the weapons and ammunition from his car to inside the theater.

25. Any person who wished to make a surreptitious and unauthorized entry into the theater could easily determine that the lack of security personnel and lack of any alarm on the door at the right, front by the screen of Auditorium would allow them to leave the theater, and re-enter without fear of being discovered, interfered with, monitored or stopped.

26. The gunman made one or more trips from his car through the open exterior door of Auditorium 9, bringing his arsenal and ammunition through that open door. Through that time, no employee or security personnel contacted him, deterred him, monitored him or stopped him from that re-entry.

27. The gunman's conduct in exiting the theater, parking his car, preparing for his assault, and re-entering Auditorium 9 took place over an extended period of time.

28. Plaintiff's son also attended the July 20, 2012 midnight showing of "The Dark Knight Rises." Plaintiff's son was one of many members of the public who purchased a ticket from Defendant.

29. Plaintiff's son was seated in Auditorium 9 of the Century Aurora 16.

30. The gunman began his assault by throwing tear gas canisters into the auditorium. The gunman was still standing near the doorway at the bottom of the theater, to the right of the screen, when he began the assault.

31. During the incident, the gunman opened fire with various firearms and shot several people. Several individuals in Auditorium 9, and at least one person in Auditorium 8, were struck by gunfire.

32. Matthew McQuinn used his body to shield his girlfriend from gunfire.

33. Matthew McQuinn died in the theatre complex.

34. After the initial episode where the gunman threw the tear gas canisters, the gunman continued shooting people for many minutes. All through the incident, the movie continued to play, and the house lights remained very low or off.

35. There was neither an alarm activated during the many minutes while the gunman was stockpiling his arsenal, nor when he re-entered and was inside the theater shooting people.

36. Upon information and belief, there was no action taken by theater employees to safely evacuate the many people left in Auditorium 9.

37. The gunman continued shooting through the Auditorium until eventually his weapon jammed and the shooting stopped.

38. No security personnel and no employee intervened during the entirety of the incident. The gunman simply walked back out of the theater through the same door he used to re-enter, and sat in his car.

39. Even after the gunman left the theater and there was no further gunfire, for many minutes no theater personnel took action to assist the injured who were still in Auditorium 9. It took several minutes for law enforcement to finally arrive. During the entirety of the time, the movie continued playing and the house lights remained very low or off.

40. At no time during the entirety of this incident was there any action taken by theater personnel to assist or evacuate those who were injured by the gunman.

FIRST CLAM FOR RELIEF:
PREMISES LIABILITY PURSUANT TO C.R.S. § 13-21-115

41. Defendant operated and maintained the theater, and is a "landowner" under the definition of that term included in the Colorado Premises Liability Act (PLA), found at C.R.S. § 13-21-115(1).

42. Plaintiff's son was an "invitee" while attending this movie showing under the definition of that term included in the PLA, specifically C.R.S. § 13-21-115(5)(a).

43. Accordingly, Defendant had a duty of reasonable care to protect Plaintiff's son and others like him, against dangers of which Defendant actually knew or should have known, pursuant to C.R.S. § 13-15-115(3)(c)(I). Those dangers included the fact that dangerous and criminal activity had previously taken place at the theater.

44. Specifically, Defendant failed to comply with its duties to Plaintiff's son, Matthew McQuinn, and other like him, in the following respects:

   a. Failure to employ and have present at the time of the showing of this movie security guards (including, but not limited to, off-duty law enforcement officers) to protect against and reduce the risk of unlawful conduct that posed a risk of injury or death to patrons;
   b. Failure to provide reasonable protection against surreptitious, unauthorized entry into the darkened theater viewing areas;
   c. Failure to provide reasonable door entry security devices, including, but not limited to, automatic locking doors, alarms, warning signals and other such devices on the door located to the right, front of Auditorium 9;
   d. Failure to provide other reasonable security devices such as one-way security doors, exit doors interlocked with warning signals, alarms, light

        or other devices which would put personnel on notice of any surreptitious, unauthorized entry into the darkened theater viewing areas;

    e.    Failure to develop, establish and institute adequate emergency or first-aid response and evacuation plans and procedures for patrons in the theater in the event circumstances called for such procedures;

    f.    Failure to properly train employees in emergency, crisis and first-aid response and evacuation procedures;

    g.    Failure to properly train employees or provide reasonable surveillance procedures including, but not limited to, surveillance devices, monitors, cameras and human surveillance or monitoring of suspicious activity;

    h.    Failure to develop, establish, and institute adequate security measures that would protect patrons in the theatre from foreseeable harm, including acts of a criminal nature.

45. Defendant knew or should have known of the dangers and risks caused by its failures as noted above.

46. Defendant breached its duties as a landowner under the PLA by its failures as noted above, thereby allowing a dangerous condition to exist and /or by creating a dangerous condition on its premises.

47. As a direct and proximate result of these dangerous conditions, Plaintiff's son was killed and as a result Plaintiff has and will suffer emotional and psychological distress, economic damages, losses, extreme mental and emotional pain and suffering, loss of enjoyment of life, and fear.

## SECOND CLAIM FOR RELIEF:
## NEGLIGENCE

48. Plaintiff hereby incorporates the allegations contained in paragraphs above as if set forth fully herein.

49. Defendant had a duty to exercise reasonable care to provide for the safety and security of its patrons.

50. Defendant violated it s duty of reasonable care that it owed its patrons in the following, but not limited to the following ways:

    a.    Failure to employ and have present at the time of the showing of this movie security guards (including, but not limited to, off-duty law enforcement officers) to protect against and reduce the risk of unlawful conduct that posed a risk of injury or death to patrons;

    b. Failure to provide reasonable protection against surreptitious, unauthorized entry into the darkened theater viewing areas;

    c. Failure to provide reasonable door entry security devices, including, but not limited to, automatic locking doors, alarms, warning signals and other such devices on the door located to the right, front of Auditorium 9;

    d. Failure to provide other reasonable security devices such as one-way security doors, exit doors interlocked with warning signals, alarms, light or other devices which would put personnel on notice of any surreptitious, unauthorized entry into the darkened theater viewing areas;

    e. Failure to develop, establish and institute adequate emergency or first-aid response and evacuation plans and procedures for patrons in the theater in the event circumstances called for such procedures;

    f. Failure to properly train employees in emergency, crisis and first-aid response and evacuation procedures;

    g. Failure to properly train employees or provide reasonable surveillance procedures including, but not limited to, surveillance devices, monitors, cameras and human surveillance or monitoring of suspicious activity;

    h. Failure to develop, establish, and institute adequate security measures that would protect patrons in the theatre from foreseeable harm, including acts of a criminal nature.

  51. As a direct and proximate result of Defendant's negligent conduct, Plaintiff suffered injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF:
### WRONGFUL DEATH PURSUANT TO C.R.S § 13-21-201

  52. Plaintiff herein incorporates all preceding allegations of her Complaint.

  53. The breach of Defendant's duties under the PLA combined with the negligence of the Defendant resulted in the wrongful death of the Plaintiff's son, Matthew McQuinn.

  WHEREFORE, Plaintiff prays for judgment in her favor and against the Defendant in an amount which will fully and fairly compensate her for damages, losses, and injuries, both past and future. Plaintiff also requests judgment in her favor for pre-judgment and post-judgment interest as proved by law, for costs, attorney's fees, expert witness expenses and for such other and further relief as the Court deems proper.

PLAINTIFF REQUESTS THAT ALL ISSUES BE TRIED TO A JURY.

Dated this 11 day of October, 2012.   Respectfully submitted,
**MALMAN LAW FIRM, LLC**
*Duly Signed Original On File at*
*Offices of Malman Law Firm, LLC*

By:   /s/ Jerome S. Malman
         Jerome S. Malman, #2795

Plaintiff's Address:
2115 Duquesne Drive
Springfield, Ohio 45506